FILED

01 JUN 25 PM 2:55

CLERK, U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA

UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

TIM DUNN,

Plaintiff, CIVIL ACTION No. 8:01CV1216-T-30 MAP

v.

UNUM LIFE INSURANCE
COMPANY OF AMERICA,

Defendant.
_____________________________/

# COMPLAINT

The Plaintiff, TIM DUNN, sues the Defendant, UNUM LIFE INSURANCE COMPANY OF AMERICA ("UNUM"), and states:

## Allegations Common to All Counts

1. This is an action under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 et seq. This Court has jurisdiction pursuant to ERISA §502, 29 U.S.C. §1132.

2. Plaintiff is a participant in each of the plans, funds, programs, or arrangements described herein, or in the alternative, was at all relevant times a participant in each of the plans, funds, programs, or arrangements described herein.

3. Plaintiff was an employee and/or a former employee of Velda Farms Dairies and/or Suiza Foods, Inc. at a facility in Polk County, Florida where he participated in the plan described below.

4. Velda Farms Dairies and/or Suiza Foods, Inc. is the Plan Sponsor of an employee welfare benefit plan (hereafter referred to as "the Plan") which provides benefits

T10824

for "disability" as provided in the terms of the Plan Document attached hereto as Exhibit "A", or in accordance with another document not yet provided to Plaintiff.

5. UNUM is an insurance company which issued an insurance policy to fund the Plan's payments of benefits.

6. UNUM is the Plan Administrator of the Plan, or in the alternative, is the fiduciary charged with making claim determinations under the Plan.

9. The claim for benefits alleged in this action will be paid from UNUM's assets if Plaintiff is successful.

10. As a fiduciary, UNUM operates under a conflict of interest.

11. UNUM denial of benefits in this action is subject to heightened abuse of discretion review by this Court.

**Count I**

12. This is an action for welfare benefits under ERISA, pursuant to ERISA §502 (a)(1)(B), 29 U.S.C. §1132(a)(1)(B)

13. Plaintiff realleges paragraphs 1 through 11 as if fully stated herein and further alleges:

14. With respect to all claims made herein, Plaintiff has exhausted his administrative remedies and/or such exhaustion of remedies is excused.

15. Plaintiff has been disabled as defined by The Plan since March 27, 1999.

14. UNUM paid Plan benefits to Plaintiff through August 1, 2000 at which time UNUM terminated benefits.

15. UNUM has failed and refused to pay benefits since August 1, 2000.

16. Plaintiff is entitled to certain benefits under the Plan consisting of benefits for long term disability since August 1, 2000 and continuing through the date this action was filed.

17. Each monthly benefit payment from August 1, 2000 through the date of filing this action became a liquidated sum on the date each such payment became due and payable.

18. Plaintiff believes that he is entitled to the Plan benefits identified herein because:

(a) The benefits are permitted under the Plan.

(b) The Plaintiff has satisfied all conditions to be eligible to receive the benefits.

(c) Plaintiff has not waived or otherwise relinquished his entitlement to the benefit.

19. Pursuant to ERISA §502(g), 29 U.S.C. §1132(g), the plaintiff is entitled to an award of reasonable attorney fees and costs incurred in this action brought under ERISA. Plaintiff has been required to obtain the undersigned attorney to represent him in this matter and has agreed to a reasonable attorney fee as compensation to him for his services.

WHEREFORE, Plaintiff, TIM DUNN, asks this Court to enter judgment against Defendant, UNUM LIFE INSURANCE COMPANY OF AMERICA, finding that:

(a) The Plaintiff is entitled to long term disability benefits from August 1, 2000 through the date of the filing of this lawsuit; and

(b) Award benefits in the amount not paid to the Plaintiff from August 1, 2000 to the date of filing this lawsuit, together with interest at the legal rate on each monthly payment from the date it became due until the date it is paid; or in the alternative, enter an Order and Judgment requiring that Defendant pay such benefits and interest; and

(c) Award reasonable attorney fees and costs incurred in this action; and

(d) For such other and further relief as this Court deems just and proper, including but not limited to remanding Plaintiff's claim to the Plan Administrator for action on benefits which accrued after the date this lawsuit was filed.

***In addition or in the alternative to Count I, Plaintiff seeks equitable relief as follows:***

**Count II**

20. This is an action to enjoin an act or practice which violates the provisions of ERISA and/or the Plan or for other appropriate equitable relief to redress such violations or to enforce the provisions of ERISA or the Plan pursuant to ERISA §502 (a)(3), 29 U.S.C. §1132(a)(3)

21. Plaintiff realleges paragraphs 1 through 11 as if fully stated herein and further alleges:

22. UNUM terminated Plaintiff's benefits under the Plan effective August 1, 2000.

23. Plaintiff attempted to exhaust administrative remedies to appeal UNUM's termination of benefits.

24. On or about April 9, 2001, Plaintiff, through the undersigned counsel,

submitted additional relevant information which included a Vocational Evaluation report from John A. Orphanidys, M.A., CRC, CVE, CCM to UNUM for consideration as part of the administrative appeal. A copy of that submission is attached hereto and incorporated herein as Exhibit "B".

25. UNUM refused to consider this additional information, and returned the original submission to the undersigned counsel with the letter attached hereto and incorporated herein as Exhibit "C".

26. Pursuant to ERISA §502(g), 29 U.S.C. §1132(g), the plaintiff is entitled to an award of reasonable attorney fees and costs incurred in this action brought under ERISA. Plaintiff has been required to obtain the undersigned attorney to represent him in this matter and has agreed to a reasonable attorney fee as compensation to him for his services.

WHEREFORE, Plaintiff, TIM DUNN, asks this Court to enter judgment against Defendant, UNUM LIFE INSURANCE COMPANY OF AMERICA,:

(a) Finding that UNUM's refusal to consider the information submitted by Plaintiff on or about April 9, 2001 was an abuse of discretion and enjoining UNUM from denying long term disability benefits from August 1, 2000 through the date of the filing of this lawsuit; or, in the alternative,

(b) Remanding this matter to UNUM for further processing of Plaintiff's administrative appeal to consider the April 9, 2001 submission by Plaintiff in support of his administrative appeal, and

(c) Award reasonable attorney fees and costs incurred in this action; and

(d) For such other and further relief as this Court deems just and proper, including but not limited to remanding Plaintiff's claim to the Plan Administrator for action on benefits which accrued after the date this lawsuit was filed.

DATED, this 22ND day of June, 2001.

Respectfully submitted,

LAW OFFICES OF ANDERSON & TUCKER

JOHN V. TUCKER, ESQUIRE
Fla. Bar #0899917
2101 - 5th Avenue North/P.O. Box 360
St. Petersburg, FL 33731
(727) 323-8886
(727) 323-3252 (fax)
Attorney for Plaintiff and Trial Counsel

DRAFT______

UNUM.

**GROUP INSURANCE POLICY**
**NON-PARTICIPATING**

**POLICYHOLDER:** Suiza Foods Corporation

**POLICY NUMBER:** 23601 003

**POLICY EFFECTIVE DATE:** January 1, 1999

**POLICY ANNIVERSARY DATE:** January 1

**GOVERNING JURISDICTION:** Texas

UNUM Life Insurance Company of America (referred to as UNUM) will provide benefits under this policy. UNUM makes this promise subject to all of this policy's provisions.

The policyholder should read this policy carefully and contact UNUM promptly with any questions. This policy is delivered in and is governed by the laws of the governing jurisdiction and to the extent applicable by the Employee Retirement Income Security Act of 1974 (ERISA) and any amendments. This policy consists of:

- all policy provisions and any amendments and/or attachments issued;
- employees' signed applications; and
- the certificate of coverage.

This policy may be changed in whole or in part. Only an officer or a registrar of UNUM can approve a change. The approval must be in writing and endorsed on or attached to this policy. No other person, including an agent, may change this policy or waive any part of it.

Signed for UNUM at Portland, Maine on the Policy Effective Date.

President

Secretary

UNUM Life Insurance Company of America
2211 Congress Street
Portland, Maine 04122

Copyright 1993, UNUM Life Insurance Company of America

Countersigned by______________________________
Licensed Resident Agent



EXHIBIT A

DRAFT______

## IMPORTANT NOTICE

**This is not a policy of Workers' Compensation Insurance. The Employer does not become a subscriber to the Workers' Compensation system by purchasing this policy, and if the Employer is a nonsubscriber, the Employer loses those benefits which would otherwise accrue under the Workers' Compensation laws. The Employer must comply with the Workers' Compensation law as it pertains to nonsubscribers and the required notification that must be filed and posted.**

DRAFT________

**IMPORTANT NOTICE**

To obtain information or make a complaint:

You may call UNUM's toll-free telephone number for information or to make a complaint at:

**1-800-321-3889**
**OPTION NUMBER 2**

You may also write to UNUM at:

Deborah J. Jewett, Manager
Customer Relations
UNUM Life Insurance
Company of America
2211 Congress Street
Portland, Maine 04122

You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights or complaints at:

**1-800-252-3439**

You may also write the Texas Department of Insurance
P.O. Box 149104
Austin, TX 78714-9104
FAX # (512) 475-1771

**PREMIUMS OR CLAIM DISPUTES:**

Should you have a dispute concerning your premium or about a claim, you should contact the company first. If the dispute is not resolved, you may contact the Texas Department of Insurance (TDI).

**ATTACH THIS NOTICE TO YOUR POLICY:**

This notice is for information only and does not become a part or condition of the attached document.

**AVISO IMPORTANTE**

Para obtener informacion o para someter una queja:

Usted puede llamar al numero de telefono gratis de UNUM para informacion o para someter una queja al:

**1-800-321-3889**
**OPCION NUMERO 2**

Usted tambien puede escribir a UNUM:

Deborah J. Jewett
Gerente de Relaciones al Cliente
UNUM Life Insurance
Company of America
2211 Congress Street
Portland, Mane 04122

Puede comunicarse con el Departamento de Seguros de Texas para obtener informacion acerca de companias, coberturas, derechos o quejas al:

**1-800-252-3439**

Puede escribir al Departamento de Seguros de Texas
P.O. Box 149104
Austin, TX 78714-9104
FAX # (512) 475-1771

**DISPUTAS SOBRE PRIMAS O RECLAMOS:**

Si tiene una disputa concerniente a su prima o a un reclamo, debe comunicarse con el la compania primero. Si no se resuelve la disputa, puede entonces comunicarse con el departamento (TDI).

**UNA ESTE AVISO A SU POLIZA:**

Este aviso es solo para proposito de informacion y no se convierte en parte o condicion del documento adjunto.

DRAFT______

## LONG TERM DISABILITY

## OTHER BENEFIT FEATURES

***WHAT BENEFITS WILL BE PROVIDED TO YOUR FAMILY IF YOU DIE? (Survivor Benefit)***

When UNUM receives proof that you have died, we will pay your **eligible survivor** a lump sum benefit equal to 3 months of your gross disability payment if, on the date of your death:

- your disability had continued for 180 or more consecutive days; and
- you were receiving or were entitled to receive payments under the plan.

If you have no eligible survivors, payment will be made to your estate, unless there is none. In this case, no payment will be made.

However, we will first apply the survivor benefit to any overpayment which may exist on your claim.

***WHAT IF YOU HAVE A DISABILITY DUE TO A PRE-EXISTING CONDITION WHEN YOUR EMPLOYER CHANGES INSURANCE CARRIERS TO UNUM? (Continuity of Coverage)***

UNUM may send a payment if your disability results from a pre-existing condition if, you were:

- in active employment and insured under the plan on its effective date; and
- insured by the prior policy at the time of change.

In order to receive a payment you must satisfy the pre-existing condition provision under:

1. the UNUM plan; or
2. the prior carrier's plan, if benefits would have been paid had that policy remained in force.

If you do not satisfy Item 1 or 2 above, UNUM will not make any payments.

If you satisfy Item 1, we will determine your payments according to the UNUM plan provisions.

If you only satisfy Item 2, we will administer your claim according to the UNUM plan provisions. However, your payment will be the lesser of:

a. the monthly benefit that would have been payable under the terms of the prior plan if it had remained inforce; or
b. the monthly payment under the UNUM plan.

Your benefits will end on the earlier of the following dates:

1. the end of the maximum benefit period under the plan; or
2. the date benefits would have ended under the prior plan if it had remained in force.

DRAFT______

## OTHER SERVICES

These services are also available from us as part of your UNUM Long Term Disability plan.

***HOW CAN UNUM HELP YOUR EMPLOYER IDENTIFY AND PROVIDE WORKSITE MODIFICATION?***

A worksite modification might be what is needed to allow you to perform the material and substantial duties of your regular occupation with your Employer. One of our designated professionals will assist you and your Employer to identify a modification we agree is likely to help you remain at work or return to work. This agreement will be in writing and must be signed by you, your Employer and UNUM.

When this occurs, UNUM will reimburse your Employer for the cost of the modification, up to the greater of:

- $1,000; or
- the equivalent of 2 months of your monthly benefit.

This benefit is available to you on a one time only basis.

***HOW CAN UNUM'S REHABILITATION SERVICE HELP YOU RETURN TO WORK?***

UNUM has a vocational rehabilitation program available to assist you to return to work. This program is offered as a service, and is voluntary on your part and on UNUM's part.

In addition to referrals made to the rehabilitation program by our claims paying personnel, you may request to have your claim file reviewed by one of UNUM's rehabilitation professionals. As your file is reviewed, medical and vocational information will be analyzed to determine if rehabilitation services might help you return to gainful employment.

Once the initial review is completed, UNUM may elect to offer you a return-to-work program. The return-to-work program may include, but is not limited to, the following services:

- coordination with your Employer to assist you to return to work;
- evaluation of adaptive equipment to allow you to return to work;
- vocational evaluation to determine how your disability may impact your employment options;
- job placement services;
- resume preparation;
- job seeking skills training; or
- retraining for a new occupation.

***HOW CAN UNUM'S SOCIAL SECURITY CLAIMANT ADVOCACY PROGRAM ASSIST YOU WITH OBTAINING SOCIAL SECURITY DISABILITY BENEFITS?***

In order to be eligible for assistance from UNUM's Social Security claimant advocacy program, you must be receiving monthly payments from us. UNUM can

provide expert advice regarding your claim and assist you with your application or appeal.

Receiving Social Security benefits may enable:

- you to receive Medicare after 24 months of disability payments;
- you to protect your retirement benefits; and
- your family to be eligible for Social Security benefits.

We can assist you in obtaining Social Security disability benefits by:

- helping you find appropriate legal representation;
- obtaining medical and vocational evidence; and
- reimbursing pre-approved case management expenses.

DRAFT______

# ERISA

## SUMMARY PLAN DESCRIPTION

**Name of Plan:**
Suiza Foods Corporation

**Policy Number:**
23601 003

**Participants Included:**
Refer to Eligible Group(s) under each plan.

**Name and Address of Employer:**
Suiza Foods Corporation
2515 McKinney Avenue, Suite 1200, LB30
Dallas, Texas
75201-1978

**Contributions:**
Refer to "Who Pays For Your Coverage" under each plan.

**Plan Identification Number:**
a. Employer IRS Identification #: 75-2559681
b. Plan #: 501

**Plan Year Ends:**
December 31

**Plan Administrator, Name, Address, and Telephone Number:**
Suiza Foods Corporation
2515 McKinney Avenue, Suite 1200, LB30
Dallas, Texas
75201-1978
(615) 340-7835

**Agent for Service of Legal Process on the Plan:**
Suiza Foods Corporation
2515 McKinney Avenue, Suite 1200, LB30
Dallas, Texas
75201-1978

### *TYPE OF ADMINISTRATION*

Insurer Administration

### *AMENDING THE EMPLOYER'S ERISA PLAN*

The Employer's ERISA plan may be changed in whole or in part by the Employer's company. Such changes must be in writing and endorsed on or attached to the ERISA plan.

DRAFT_______

documents filed by the plan with the U.S. Department of Labor, such as detailed annual reports and plan descriptions;

- obtain copies of all plan documents and other plan information upon written request to the Plan Administrator. The Plan Administrator may make a reasonable charge for the copies; and
- receive a summary of the plan's annual financial report. The Plan Administrator is required by law to furnish each participant with a copy of this summary annual report.

In addition to creating rights for plan participants, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan.

The people who operate your plan, called "fiduciaries" of the plan, have a duty to do so prudently and in the interest of you and other plan participants and beneficiaries.

No one, including your Employer, or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a benefit or exercising your rights under ERISA.

If your claim for a benefit is denied, in whole or in part, you must receive a written explanation of the reason for the denial. You have the right to have your claim reconsidered.

Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request materials from the plan and do not receive them within 30 days, you may file suit in a federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the Administrator.

If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or federal court. If it should happen that plan fiduciaries misuse the plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a federal court. The court will decide who should pay court costs and legal fees. If you are successful, the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.

If you have any questions about your plan, you should contact the Plan Administrator.

If you have any questions about this statement or about your rights under ERISA, you should contact the nearest office of the Pension and Welfare Benefits Administration, U.S. Department of Labor, listed in your telephone directory or the Division of Technical Assistance and Inquiries, Pension and Welfare Benefits Administration, U.S. Department of Labor, 200 Constitution Avenue, N.W., Washington, D.C. 20210.

## *WHAT IF YOUR CLAIM IS DENIED?*

In the event that your claim is denied, either in full or in part, UNUM will *notify you* in writing within 90 days after your claim form was filed. Under special circumstances, UNUM is allowed an additional period of not more than 90 days (180 days in total)

DRAFT______

### *AMENDING UNUM'S POLICY*

The Policy may be changed in whole or in part. The Employer can request a Policy change. Only an officer or registrar of UNUM can approve a change. The change must be in writing and endorsed on or attached to the Policy.

NOTE: If you end active employment, see your supervisor to determine what arrangements, if any, may be made to continue your coverage beyond the date you end active employment.

### *WHO CAN CANCEL THE POLICY OR A PLAN UNDER THE POLICY?*

The policy or a plan under the policy can be cancelled:

- by UNUM; or
- by the Policyholder.

UNUM may cancel or offer to modify the policy or a plan if:

- there is less than 75% participation of those eligible employees who pay all or part of their premium for a plan; or
- there is less than 100% participation of those eligible employees for a Policyholder paid plan;
- the Policyholder does not promptly provide UNUM with information that is reasonably required;
- the Policyholder fails to perform any of its obligations that relate to the policy;
- fewer than 10 employees are insured under a plan;
- the Policyholder fails to pay any premium within the 31 day grace period.

If UNUM cancels the policy or a plan for reasons other than the Policyholder's failure to pay premium, a written notice will be delivered to the Policyholder at least 31 days prior to the cancellation date.

If the premium is not paid during the grace period, the policy or plan will terminate automatically at the end of the grace period. The Policyholder is liable for premium for coverage during the grace period. The Policyholder must pay UNUM all premium due for the full period each plan is inforce.

The Policyholder may cancel the policy or a plan by written notice delivered to UNUM at least 31 days prior to the cancellation date. When both the Policyholder and UNUM agree, the policy or a plan can be cancelled on an earlier date. If UNUM or the Policyholder cancels the policy or a plan, coverage will end at 12:00 midnight on the last day of coverage.

If the policy or a plan is cancelled, the cancellation will not affect a payable claim.

### *WHAT ARE YOUR RIGHTS UNDER ERISA?*

As a participant in this plan, you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA). ERISA provides that all plan participants shall be entitled to:

- examine, without charge, at the Plan Administrator's office and at other specified locations, all plan documents including insurance contracts, and copies of all

within which to notify you of its decision. If such an extension is required, you will receive a written notice from UNUM indicating the reason for the delay and the date you may expect a final decision. UNUM's notice of denial shall include:

- the specific reason or reasons for denial with reference to those policy provisions on which the denial is based;
- a description of any additional material or information necessary to complete the claim and of why that material or information is necessary; and
- the steps to be taken if you or your beneficiary wish to have the decision reviewed.

Please note that if UNUM does not respond to your claim within the time limits set forth above, you should automatically assume that your claim has been denied and you should begin the appeal process at that time.

***WHAT DO YOU DO TO APPEAL?***

If you or your authorized representative appeal a denied claim, it must be submitted within 60 days after you receive UNUM's notice of denial. You have the right to:

- submit a request for review, in writing, to UNUM;
- review pertinent documents; and
- submit issues and comments in writing to UNUM.

UNUM will make a full and fair review of the claim and may require additional documents as it deems necessary or desirable in making such a review. A final decision on the review shall be made not later than 60 days following receipt of the written request for review. If special circumstances require an extension of time for processing, you will be notified of the reasons for the extension, and a decision shall be made not later than 120 days following receipt of the request for review. The final decision on review shall be furnished in writing and shall include the reasons for the decision with reference, again, to those policy provisions upon which the final decision is based.

DRAFT______

## GLOSSARY

**ACTIVE EMPLOYMENT** means you are working for your Employer for earnings that are paid regularly and that you are performing the material and substantial duties of your regular occupation. You must be working at least the minimum number of hours as described under Eligible Group(s) in each plan.

Your work site must be:

- your Employer's usual place of business;
- an alternative work site at the direction of your Employer, including your home; or
- a location to which your job requires you to travel.

Normal vacation is considered active employment.
Temporary and seasonal workers are excluded from coverage.

**DEDUCTIBLE SOURCES OF INCOME** means income from deductible sources listed in the plan which you receive or are entitled to receive while you are disabled. This income will be subtracted from your gross disability payment.

**DISABILITY EARNINGS** means the earnings which you receive while you are disabled and working, plus the earnings you could receive if you were working to your maximum capacity.

**DOCTOR** means:

- a person performing tasks that are within the limits of his or her medical license; and
- a person who is licensed to practice medicine and prescribe and administer drugs or to perform surgery; or
- a person with a doctoral degree in Psychology (Ph.D. or Psy.D.) whose primary practice is treating patients; or
- a person who is a legally qualified medical practitioner according to the laws and regulations of the governing jurisdiction.

UNUM will not recognize you, or your spouse, children, parents or siblings as a doctor for a claim that you send to us.

**ELIMINATION PERIOD** means a period of continuous disability which must be satisfied before you are eligible to receive benefits from UNUM.

**EMPLOYEE** means a citizen or permanent resident of the United States or Canada who is in active employment in the United States with the Employer unless an exception is applied for and approved in writing by UNUM.

**EMPLOYER** means the Policyholder, and includes any division, subsidiary or affiliated company named in the policy.

**EVIDENCE OF INSURABILITY** means a statement of your medical history which UNUM will use to determine if you are approved for coverage. Evidence of insurability will be at UNUM's expense.

DRAFT______

**GAINFUL OCCUPATION** means an occupation that is or can be expected to provide you with an income at least equal to your gross disability payment within 12 months of your return to work.

**GRACE PERIOD** means the period of time following the premium due date during which premium payment may be made.

**GROSS DISABILITY PAYMENT** means the benefit amount before UNUM subtracts deductible sources of income and disability earnings.

**HOSPITAL OR INSTITUTION** means an accredited facility licensed to provide care and treatment for the condition causing your disability.

**INDEXED MONTHLY EARNINGS** means your monthly earnings adjusted on each anniversary of benefit payments by the lesser of 10% or the current annual percentage increase in the Consumer Price Index. Your indexed monthly earnings may increase or remain the same, but will never decrease.

The Consumer Price Index (CPI-W) is published by the U.S. Department of Labor. UNUM reserves the right to use some other similar measurement if the Department of Labor changes or stops publishing the CPI-W.

Indexing is only used to determine your percentage of lost earnings while you are disabled and working.

**INJURY** means a bodily injury that is the direct result of an accident and not related to any other cause. Disability must begin while you are covered under the plan.

**INSURED** means any person covered under a plan.

**LAW, PLAN OR ACT** means the original enactments of the law, plan or act and all amendments.

**LAYOFF** or **LEAVE OF ABSENCE** means you are temporarily absent from active employment for a period of time that has been agreed to in advance in writing by your Employer.

Your normal vacation time or any period of disability is not considered a temporary layoff or leave of absence.

**LIMITED** means what you cannot or are unable to do.

**MATERIAL AND SUBSTANTIAL DUTIES** means duties that:

- are normally required for the performance of your regular occupation; and
- cannot be reasonably omitted or modified, except that if you are required to work on average in excess of 40 hours per week, UNUM will consider you able to perform that requirement if you are working or have the capacity to work 40 hours per week.

**MAXIMUM CAPACITY** means, based on your restrictions and limitations:

- during the first 12 months of disability, the greatest extent of work you are able to do in your regular occupation, that is reasonably available.

DRAFT______

- beyond 12 months of disability, the greatest extent of work you are able to do in any occupation, that is reasonably available, for which you are reasonably fitted by education, training or experience.

**MAXIMUM PERIOD OF PAYMENT** means the longest period of time UNUM will make payments to you for any one period of disability.

**MENTAL ILLNESS** means a psychiatric or psychological condition regardless of cause such as schizophrenia, depression, manic depressive or bipolar illness, anxiety, personality disorders and/or adjustment disorders or other conditions. These conditions are usually treated by a mental health provider or other qualified provider using psychotherapy, psychotropic drugs, or other similar methods of treatment.

**MONTHLY BENEFIT** means the total benefit amount for which an employee is insured under this plan subject to the maximum benefit.

**MONTHLY EARNINGS** means your gross monthly income from your Employer as defined in the plan.

**MONTHLY PAYMENT** means your payment after any deductible sources of income have been subtracted from your gross disability payment.

**PART-TIME BASIS** means the ability to work and earn 20% or more of your indexed monthly earnings.

**PAYABLE CLAIM** means a claim for which UNUM is liable under the terms of the policy.

**PLAN** means a line of coverage under the policy.

**POLICYHOLDER** means the Employer to whom the policy is issued.

**PRE-EXISTING CONDITION** means a condition for which you received medical treatment, consultation, care or services including diagnostic measures, or took prescribed drugs or medicines for your condition during the given period of time as stated in the plan.

**RECURRENT DISABILITY** means a disability which is:

- caused by a worsening in your condition; and
- due to the same cause(s) as your prior disability for which UNUM made a Long Term Disability payment.

**REGULAR CARE** means:

- you personally visit a doctor as frequently as is medically required, according to generally accepted medical standards, to effectively manage and treat your disabling condition(s); and
- you are receiving the most appropriate treatment and care which conforms with generally accepted medical standards, for your disabling condition(s) by a doctor whose specialty or experience is the most appropriate for your disabling condition(s), according to generally accepted medical standards.

DRAFT

**REGULAR OCCUPATION** means the occupation you are routinely performing when your disability begins. UNUM will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location.

**RETIREMENT PLAN** means a defined contribution plan or defined benefit plan. These are plans which provide retirement benefits to employees and are not funded entirely by employee contributions. Retirement Plan includes but is not limited to any plan which is part of any federal, state, county, municipal or association retirement system.

**SALARY CONTINUATION OR ACCUMULATED SICK LEAVE** means continued payments to you by your Employer of all or part of your monthly earnings, after you become disabled as defined by the Policy. This continued payment must be part of an established plan maintained by your Employer for the benefit of all employees covered under the Policy. Salary continuation or accumulated sick leave does not include compensation paid to you by your Employer for work you actually perform after your disability begins. Such compensation is considered disability earnings, and would be taken into account in calculating your monthly payment.

**SELF-REPORTED SYMPTOMS** means the manifestations of your condition which you tell your doctor, that are not verifiable using tests, procedures or clinical examinations standardly accepted in the practice of medicine. Examples of self-reported symptoms include, but are not limited to headaches, pain, fatigue, stiffness, soreness, ringing in ears, dizziness, numbness and loss of energy.

**SICKNESS** means an illness or disease. Disability must begin while you are covered under the plan.

**SURVIVOR, ELIGIBLE** means your spouse, if living; otherwise your children under age 25.

**TOTAL COVERED PAYROLL** means the total amount of monthly earnings for which employees are insured under this plan.

**WAITING PERIOD** means the continuous period of time (shown in each plan) that you must be in active employment in an eligible group before you are eligible for coverage under a plan.

**WE, US** and **OUR** means UNUM Life Insurance Company of America.

**YOU** means an employee who is eligible for UNUM coverage.

DRAFT______

## TABLE OF CONTENTS


BENEFITS AT A GLANCE .......... B@G-LTD-1
LONG TERM DISABILITY PLAN .......... B@G-LTD-1
CLAIM INFORMATION .......... LTD-CLM-1
LONG TERM DISABILITY .......... LTD-CLM-1
POLICYHOLDER PROVISIONS .......... EMPLOYER-1
CERTIFICATE SECTION .......... CC.FP-1
GENERAL PROVISIONS .......... EMPLOYEE-1
LONG TERM DISABILITY .......... LTD-BEN-1
BENEFIT INFORMATION .......... LTD-BEN-1
OTHER BENEFIT FEATURES .......... LTD-OTR-1
OTHER SERVICES .......... SERVICES-1
ERISA .......... ERISA-1
GLOSSARY .......... GLOSSARY-1

DRAFT

# BENEFITS AT A GLANCE

## LONG TERM DISABILITY PLAN

This long term disability plan provides financial protection for you by paying a portion of your income while you are disabled. The amount you receive is based on the amount you earned before your disability began. In some cases, you can receive disability payments even if you work while you are disabled.

**EMPLOYER'S ORIGINAL PLAN**
**EFFECTIVE DATE:** January 1, 1999

**POLICY NUMBER:** 23601 003

**ELIGIBLE GROUP(S):**

All full-time employees of Velda Farms, Inc. in active employment

**MINIMUM HOURS REQUIREMENT:**

Employees must be working at least 17.5 hours per week.

**WAITING PERIOD:**

For employees in an eligible group on or before January 1, 1999: 5 years of continuous active employment

For employees entering an eligible group after January 1, 1999: 5 years of continuous active employment

**WHO PAYS FOR THE COVERAGE:**

Your Employer pays the cost of your coverage.

**ELIMINATION PERIOD:**

The later of:

- 360 days; or
- the date your salary continuation payments end, if applicable.

Benefits begin the day after the elimination period is completed.

**MONTHLY BENEFIT:**

65% of monthly earnings to a maximum benefit of $6,250 per month.

Your payment may be reduced by deductible sources of income and disability earnings. Some disabilities may not be covered or may have limited coverage under this plan.

**MAXIMUM PERIOD OF PAYMENT:**

| Age at Disability | Maximum Period of Payment |
|---|---|
| Less than age 60 | To age 65, but not less than 5 years |
| Age 60 | 60 months |
| Age 61 | 48 months |
| Age 62 | 42 months |
| Age 63 | 36 months |
| Age 64 | 30 months |
| Age 65 | 24 months |
| Age 66 | 21 months |
| Age 67 | 18 months |
| Age 68 | 15 months |
| Age 69 and over | 12 months |

DRAFT______

No premium payments are required for your coverage while you are receiving payments under this plan.

**OTHER FEATURES:**

Continuity of Coverage

Minimum Benefit

Pre-Existing: 3/12

Survivor Benefit

**The above items are only highlights of this plan. For a full description of your coverage, continue reading your certificate of coverage section.**

DRAFT______

## CLAIM INFORMATION

## LONG TERM DISABILITY

### *WHEN DO YOU NOTIFY UNUM OF A CLAIM?*

We encourage you to notify us of your claim as soon as possible, so that a claim decision can be made in a timely manner. Written notice of a claim should be sent within 30 days after the date your disability begins. However, you must send UNUM written proof of your claim no later than 90 days after your elimination period. If it is not possible to give proof within 90 days, it must be given no later than 1 year after the time proof is otherwise required except in the absence of legal capacity.

The claim form is available from your Employer, or you can request a claim form from us. If you do not receive the form from UNUM within 15 days of your request, send UNUM written proof of claim without waiting for the form.

You must notify us immediately when you return to work in any capacity.

### *HOW DO YOU FILE A CLAIM?*

You and your Employer must fill out your own sections of the claim form and then give it to your attending doctor. Your doctor should fill out his or her section of the form and send it directly to UNUM.

### *WHAT INFORMATION IS NEEDED AS PROOF OF YOUR CLAIM?*

Your proof of claim, provided at your expense, must show:

- that you are under the **regular care** of a **doctor**;
- the appropriate documentation of your monthly earnings;
- the date your disability began;
- the cause of your disability;
- the extent of your disability, including restrictions and limitations preventing you from performing your regular occupation; and
- the name and address of any **hospital or institution** where you received treatment, including all attending doctors.

We may request that you send proof of continuing disability indicating that you are under the regular care of a doctor. This proof, provided at your expense, must be received within 30 days of a request by us.

In some cases, you will be required to give UNUM authorization to obtain additional medical information, and to provide non-medical information as part of your proof of claim, or proof of continuing disability. UNUM will deny your claim, or stop sending you payments, if the appropriate information is not submitted.

The initial payment for a payable claim will be made within 60 days from the date proof is received.

### *TO WHOM WILL UNUM MAKE PAYMENTS?*

UNUM will make payments to you.

***WHAT HAPPENS IF UNUM OVERPAYS YOUR CLAIM?***

UNUM has the right to recover any overpayments due to:

- fraud;
- any error UNUM makes in processing a claim; and
- your receipt of deductible sources of income.

You must reimburse us in full. We will determine the method by which the repayment is to be made.

UNUM will not recover more money than the amount we paid you.

DRAFT

# POLICYHOLDER PROVISIONS

***WHAT IS THE COST OF THIS INSURANCE?***

The initial premium for each **plan** is based on the initial rate(s) shown below.

## LONG TERM DISABILITY

***INITIAL RATE***

Monthly rate of: .36 % of **total covered payroll.**

***WAIVER OF PREMIUM***

UNUM does not require premium payments for an insured while he or she is receiving Long Term Disability payments under this plan.

***RATE GUARANTEE***

A change in premium rate will not take effect before January 1, 2001. However, UNUM may change premium rates at any time for reasons which affect the risk assumed, including those reasons shown below:

- a change occurs in this plan design;
- a division, subsidiary, or affiliated company is added or deleted;
- the number of insureds changes by 25% or more; or
- a new law or a change in any existing law is enacted which applies to this plan.

UNUM will notify the Policyholder in writing at least 31 days before a premium rate is changed. A change may take effect on an earlier date when both UNUM and the Policyholder agree.

***WHEN IS PREMIUM DUE FOR THIS POLICY?***

Premium Due Dates: January 1, 1999 and the first day of each calendar month thereafter.

The **Policyholder** must send all premiums to UNUM on or before their respective due date. The premium must be paid in United States dollars.

***WHEN ARE INCREASES OR DECREASES IN PREMIUM DUE?***

Premium increases or decreases which take effect during a policy month are adjusted and due on the next premium due date following the change. Changes will not be pro-rated daily.

If premiums are paid on other than a monthly basis, premiums for increases and decreases will result in a monthly pro-rated adjustment on the next premium due date.

UNUM will only adjust premium for the current policy year and the prior policy year. In the case of fraud, premium adjustments will be made for all policy years.

DRAFT______

### *WHAT INFORMATION DOES UNUM REQUIRE FROM THE POLICYHOLDER?*

The Policyholder must provide UNUM with the following on a regular basis:

- information about employees:
  - who are eligible to become insured;
  - whose amounts of coverage change; and/or
  - whose coverage ends;
- occupational information and any other information that may be required to manage a claim; and
- any other information that may be reasonably required.

Policyholder records that, in UNUM's opinion, have a bearing on this policy will be available for review by UNUM at any reasonable time.

Clerical error or omission by UNUM will not:

- prevent an employee from receiving coverage;
- affect the amount of an insured's coverage; or
- cause an employee's coverage to begin or continue when the coverage would not otherwise be effective.

### *WHO CAN CANCEL THIS POLICY OR A PLAN UNDER THIS POLICY?*

This policy or a plan under this policy can be cancelled:

- by UNUM; or
- by the Policyholder.

UNUM may cancel or offer to modify this policy or a plan if:

- there is less than 75% participation of those eligible employees who pay all or part of their premium for a plan; or
- there is less than 100% participation of those eligible employees for a Policyholder paid plan;
- the Policyholder does not promptly provide UNUM with information that is reasonably required;
- the Policyholder fails to perform any of its obligations that relate to this policy;
- fewer than 10 employees are insured under a plan;
- the Policyholder fails to pay any premium within the 31 day **grace period.**

If UNUM cancels this policy or a plan for reasons other than the Policyholder's failure to pay premium, a written notice will be delivered to the Policyholder at least 31 days prior to the cancellation date.

If the premium is not paid during the grace period, the policy or plan will terminate automatically at the end of the grace period. The Policyholder is liable for premium for coverage during the grace period. The Policyholder must pay UNUM all premium due for the full period each plan is inforce.

The Policyholder may cancel this policy or a plan by written notice delivered to UNUM at least 31 days prior to the cancellation date. When both the Policyholder and UNUM agree, this policy or a plan can be cancelled on an earlier date. If

DRAFT______

UNUM or the Policyholder cancels this policy or a plan, coverage will end at 12:00 midnight on the last day of coverage.

If this policy or a plan is cancelled, the cancellation will not affect a **payable claim**.

***WHAT HAPPENS TO AN EMPLOYEE'S COVERAGE UNDER THIS POLICY WHILE HE OR SHE IS ON A FAMILY AND MEDICAL LEAVE OF ABSENCE?***

We will continue the employee's coverage in accordance with the policyholder's Human Resource policy on family and medical leaves of absence if premium payments continue and the policyholder approved the employee's leave in writing.

Coverage will be continued until the end of the later of:

1. the leave period required by the federal Family and Medical Leave of Absence Act of 1993 and any amendments; or
2. the leave period required by applicable state law.

If the policyholder's Human Resource policy doesn't provide for continuation of an employee's coverage during a family and medical leave of absence, the employee's coverage will be reinstated when he or she returns to active employment.

We will not:

- apply a new waiting period;
- apply a new pre-existing conditions exclusion; or
- require evidence of insurability.

***DIVISIONS, SUBSIDIARIES OR AFFILIATED COMPANIES INCLUDE:***

NAME/LOCATION(CITY AND STATE)

None

DRAFT______

## CERTIFICATE SECTION

UNUM Life Insurance Company of America (referred to as UNUM) welcomes you as a client.

This is your certificate of coverage as long as you are eligible for coverage and you become insured. You will want to read it carefully and keep it in a safe place.

UNUM has written your certificate of coverage in plain English. However, a few terms and provisions are written as required by insurance law. If you have any questions about any of the terms and provisions, please consult UNUM's claims paying office. UNUM will assist you in any way to help you understand your benefits.

If the terms and provisions of the certificate of coverage (issued to you) are different from the policy (issued to the policyholder), the policy will govern. Your coverage may be cancelled or changed in whole or in part under the terms and provisions of the policy.

The policy is delivered in and is governed by the laws of the governing jurisdiction and to the extent applicable by the Employee Retirement Income Security Act of 1974 (ERISA) and any amendments. When making a benefit determination under the policy, UNUM has discretionary authority to determine your eligibility for benefits and to interpret the terms and provisions of the policy.

For purposes of effective dates and ending dates under the group policy, all days begin at 12:01 a.m. and end at 12:00 midnight at the Policyholder's address.

UNUM Life Insurance Company of America
2211 Congress Street
Portland, Maine 04122

DRAFT______

## GENERAL PROVISIONS

### *WHAT IS THE CERTIFICATE OF COVERAGE?*

This certificate of coverage is a written statement prepared by UNUM and may include attachments. It tells you:

- the coverage for which you may be entitled;
- to whom UNUM will make a payment; and
- the limitations, exclusions and requirements that apply within a plan.

### *WHEN ARE YOU ELIGIBLE FOR COVERAGE?*

If you are working for your Employer in an eligible group, the date you are eligible for coverage is the later of:

- the plan effective date; or
- the day after you complete your **waiting period.**

### *WHEN DOES YOUR COVERAGE BEGIN?*

When your Employer pays 100% of the cost of your coverage under a plan, you will be covered at 12:01 a.m. on the date you are eligible for coverage.

When you and your Employer share the cost of your coverage under a plan or when you pay 100% of the cost yourself, you will be covered at 12:01 a.m. on the latest of:

- the date you are eligible for coverage, if you apply for insurance on or before that date;
- the date you apply for insurance, if you apply within 31 days after your eligibility date; or
- the date UNUM approves your application, if **evidence of insurability** is required.

Evidence of insurability is required if you:

- are a late applicant, which means you apply for coverage more than 31 days after the date you are eligible for coverage; or
- voluntarily cancelled your coverage and are reapplying.

An evidence of insurability form can be obtained from your Employer.

### *WHAT IF YOU ARE ABSENT FROM WORK ON THE DATE YOUR COVERAGE WOULD NORMALLY BEGIN?*

If you are absent from work due to injury, sickness, temporary layoff or leave of absence, your coverage will begin on the date you return to active employment.

### *ONCE YOUR COVERAGE BEGINS, WHAT HAPPENS IF YOU ARE TEMPORARILY NOT WORKING?*

If you are on a temporary **layoff**, and if premium is paid, you will be covered through the end of the month that immediately follows the month in which your temporary layoff begins.

If you are on a **leave of absence**, and if premium is paid, you will be covered through the end of the month that immediately follows the month in which your leave of absence begins.

***WHEN WILL CHANGES TO YOUR COVERAGE TAKE EFFECT?***

Once your coverage begins, any increased or additional coverage will take effect immediately if you are in active employment or if you are on a covered layoff or leave of absence. If you are not in active employment due to injury or sickness, any increased or additional coverage will begin on the date you return to active employment.

Any decrease in coverage will take effect immediately but will not affect a **payable claim** that occurs prior to the decrease.

***WHEN DOES YOUR COVERAGE END?***

Your coverage under the policy or a plan ends on the earliest of:

- the date the policy or a plan is cancelled;
- the date you no longer are in an eligible group;
- the date your eligible group is no longer covered;
- the last day of the period for which you made any required contributions; or
- the last day you are in active employment except as provided under the covered layoff or leave of absence provision.

UNUM will provide coverage for a payable claim which occurs while you are covered under the policy or plan.

***WHAT ARE THE TIME LIMITS FOR LEGAL PROCEEDINGS?***

You can start legal action regarding your claim 60 days after proof of claim has been given and up to 3 years from the time proof of claim is required, unless otherwise provided under federal law.

***HOW CAN STATEMENTS MADE IN YOUR APPLICATION FOR THIS COVERAGE BE USED?***

UNUM considers any statements you or your Employer make in a signed application for coverage a representation and not a warranty. If any of the material statements you or your Employer make are not complete and/or not true at the time they are made, we can:

- reduce or deny any claim; or
- cancel your coverage from the original effective date.

We will use only statements made in a signed application as a basis for doing this. A copy of the statements will be provided to you or your beneficiary. These statements cannot be used to reduce or deny coverage if your coverage has been inforce for at least two years.

However, if the Employer gives us information about you that is incorrect, we will:

- use the facts to determine if you have coverage under the plan according to the policy provisions and in what amounts; and
- make a fair adjustment of the premium.

***HOW WILL UNUM HANDLE INSURANCE FRAUD?***

UNUM wants to ensure you and your Employer do not incur additional insurance costs as a result of the undermining effects of insurance fraud. UNUM promises to focus on all means necessary to support fraud detection, investigation, and prosecution.

It is a crime if you knowingly, and with intent to injure, defraud or deceive UNUM, or provide any information, including filing a claim, that contains any false, incomplete or misleading information. These actions, as well as submission of materially false information, will result in denial of your claim, and are subject to prosecution and punishment to the full extent under state and/or federal law. UNUM will pursue all appropriate legal remedies in the event of insurance fraud.

***DOES THE POLICY REPLACE OR AFFECT ANY WORKERS' COMPENSATION OR STATE DISABILITY INSURANCE?***

The policy does not replace or affect the requirements for coverage by any workers' compensation or state disability insurance.

***DOES YOUR EMPLOYER ACT AS YOUR AGENT OR UNUM'S AGENT?***

For purposes of the policy, your Employer acts on its own behalf or as your agent. Under no circumstances will your Employer be deemed the agent of UNUM.

DRAFT______

# LONG TERM DISABILITY

# BENEFIT INFORMATION

## *HOW DOES UNUM DEFINE DISABILITY?*

You are disabled when UNUM determines that:

- you are **limited** from performing the **material and substantial duties** of your **regular occupation** due to your **sickness** or **injury;** and
- you have a 20% or more loss in your **indexed monthly earnings** due to the same sickness or injury.

After 12 months of payments, you are disabled when UNUM determines that due to the same sickness or injury, you are unable to perform the duties of any **gainful occupation** for which you are reasonably fitted by education, training or experience.

The loss of a professional or occupational license or certification does not, in itself, constitute disability.

We may require you to be examined by a doctor, other medical practitioner or vocational expert of our choice. UNUM will pay for this examination. We can require an examination as often as it is reasonable to do so. We may also require you to be interviewed by an authorized UNUM Representative.

## *HOW LONG MUST YOU BE DISABLED BEFORE YOU ARE ELIGIBLE TO RECEIVE BENEFITS?*

You must be continuously disabled through your **elimination period.** UNUM will treat your disability as continuous if your disability stops for 30 days or less during the elimination period. The days that you are not disabled will not count toward your elimination period.

Your elimination period is the later of:

- 360 days; or
- the date your **salary continuation** payments end, if applicable.

## *CAN YOU SATISFY YOUR ELIMINATION PERIOD IF YOU ARE WORKING?*

Yes, provided you meet the definition of disability.

## *WHEN WILL YOU BEGIN TO RECEIVE PAYMENTS?*

You will begin to receive payments when we approve your claim, providing the elimination period has been met. We will send you a payment monthly for any period for which UNUM is liable.

## *HOW MUCH WILL UNUM PAY YOU IF YOU ARE DISABLED?*

We will follow this process to figure your payment:

DRAFT

1. Multiply your monthly earnings by 65%.
2. The maximum **monthly benefit** is $6,250.
3. Compare the answer from Item 1 with the maximum monthly benefit. The lesser of these two amounts is your **gross disability payment.**
4. Subtract from your gross disability payment any **deductible sources of income.**

The amount figured in Item 4 is your **monthly payment.**

***WHAT ARE YOUR MONTHLY EARNINGS?***

"Monthly Earnings" means your gross monthly income from your Employer in effect just prior to your date of disability. It includes your total income before taxes and any deductions made for pre-tax contributions to a qualified deferred compensation plan, Section 125 plan or flexible spending account. It includes overtime pay and income actually received from commissions but does not include renewal commissions, bonuses, or any other extra compensation, or income received from sources other than your Employer.

Commissions will be averaged for the lesser of: a. the 12 full calendar month period of your employment with your Employer just prior to the date disability begins; or b. the period of actual employment with your Employer.

***WHAT WILL WE USE FOR MONTHLY EARNINGS IF YOU BECOME DISABLED DURING A COVERED LAYOFF OR LEAVE OF ABSENCE?***

If you become disabled while you are on a covered layoff or leave of absence, we will use your monthly earnings from your Employer in effect just prior to the date your absence begins.

***HOW MUCH WILL UNUM PAY YOU IF YOU ARE DISABLED AND WORKING?***

We will send you the monthly payment if you are disabled and your monthly **disability earnings,** if any, are less than 20% of your indexed monthly earnings, due to the same sickness or injury.

If you are disabled and your monthly disability earnings are 20% or more of your indexed monthly earnings, due to the same sickness or injury, UNUM will figure your payment as follows:

While working, you will receive payments based on the percentage of income you are losing due to your disability.

1. Subtract your disability earnings from your indexed monthly earnings.
2. Divide the answer in Item 1 by your indexed monthly earnings. This is your percentage of lost earnings.
3. Multiply your monthly payment by the answer in Item 2.

This is the amount UNUM will pay you each month.

During the first 12 months of disability payments, if your monthly disability earnings exceed 80% of your indexed monthly earnings, UNUM will stop sending you payments and your claim will end.

Beyond 12 months of disability payments, if your monthly disability earnings exceed the gross disability payment, UNUM will stop sending you payments and your claim will end.

UNUM may require you to send proof of your monthly disability earnings at least quarterly. We will adjust your payment based on your quarterly disability earnings.

As part of your proof of disability earnings, we can require that you send us appropriate financial records which we believe are necessary to substantiate your income.

After the elimination period, if you are disabled for less than 1 month, we will send you 1/30 of your payment for each day of disability.

***HOW CAN WE PROTECT YOU IF YOUR DISABILITY EARNINGS FLUCTUATE?***

If your disability earnings routinely fluctuate widely from month to month, UNUM may average your disability earnings over the most recent 3 months to determine if your claim should continue.

If UNUM averages your disability earnings, we will not terminate your claim unless:

- During the first 12 months of disability payments, the average of your disability earnings from the last 3 months exceeds 80% of indexed monthly earnings; or
- Beyond 12 months of disability payments, the average of your disability earnings from the last 3 months exceeds the gross disability payment.

We will not pay you for any month during which disability earnings exceed the amount allowable under the plan.

***WHAT ARE DEDUCTIBLE SOURCES OF INCOME?***

UNUM will subtract from your gross disability payment the following deductible sources of income:

1. The amount that you receive or are entitled to receive under:

   - a workers' compensation law
   - an occupational disease law
   - any other **act** or **law** with similar intent.

2. The amount that you receive or are entitled to receive as disability income payments under any:

   - state compulsory benefit **act** or **law**
   - automobile liability insurance policy
   - other group insurance plan
   - governmental retirement system as a result of your job with your Employer.

3. The amount that you, your spouse and your children receive or are entitled to receive as disability payments because of your disability under:

   - the United States Social Security Act
   - the Canada Pension **Plan**
   - the Quebec Pension Plan

DRAFT

- any similar plan or act.

4. The amount that you receive as retirement payments or the amount your spouse and children receive as retirement payments because you are receiving retirement payments under:

   - the United States Social Security Act
   - the Canada Pension Plan
   - the Quebec Pension Plan
   - any similar plan or act.

5. The amount that you:

   - receive as disability payments under your Employer's **retirement plan**
   - voluntarily elect to receive as retirement payments under your Employer's retirement plan
   - receive as retirement payments when you reach the later of age 62 or normal retirement age, as defined in your Employer's retirement plan.

   Disability payments under a retirement plan will be those benefits which are paid due to disability and do not reduce the retirement benefit which would have been paid if the disability had not occurred.

   Retirement payments will be those benefits which are based on your Employer's contribution to the retirement plan. Disability benefits which reduce the retirement benefit under the plan will also be considered as a retirement benefit.

   Regardless of how the retirement funds from the retirement plan are distributed, UNUM will consider your and your Employer's contributions to be distributed simultaneously throughout your lifetime.

   Amounts received do not include amounts rolled over or transferred to any eligible retirement plan. UNUM will use the definition of eligible retirement plan as defined in Section 402 of the Internal Revenue Code including any future amendments which affect the definition.

6. The amount that you receive under Title 46, United States Code Section 688 (The Jones Act).

7. The amount that you receive from a third party (after subtracting attorney's fees) by judgment, settlement or otherwise.

With the exception of retirement payments, UNUM will only subtract deductible sources of income which are payable as a result of the same disability.

We will not reduce your payment by your Social Security retirement income if your disability begins after age 65 and you were already receiving Social Security retirement payments.

***WHAT ARE NOT DEDUCTIBLE SOURCES OF INCOME?***

UNUM will not subtract from your gross disability payment income you receive from, but not limited to, the following:

- 401(k) plans
- profit sharing plans
- thrift plans
- tax sheltered annuities
- stock ownership plans
- non-qualified plans of deferred compensation
- pension plans for partners
- military pension and disability income plans
- credit disability insurance
- franchise disability income plans
- a retirement plan from another Employer
- individual retirement accounts (IRA)
- individual disability income plans
- **salary continuation** or **accumulated sick leave** plans

***WHAT IF SUBTRACTING DEDUCTIBLE SOURCES OF INCOME RESULTS IN A ZERO BENEFIT? (Minimum Benefit)***

The minimum monthly payment is the greater of:

- $100; or
- 10% of your gross disability payment.

UNUM may apply this amount toward an outstanding overpayment.

***WHAT HAPPENS WHEN YOU RECEIVE A COST OF LIVING INCREASE FROM DEDUCTIBLE SOURCES OF INCOME?***

Once UNUM has subtracted any deductible source of income from your gross disability payment, UNUM will not further reduce your payment due to a cost of living increase from that source.

***WHAT IF UNUM DETERMINES YOU MAY QUALIFY FOR DEDUCTIBLE INCOME BENEFITS?***

When we determine that you may qualify for benefits under Item(s) 1., 2., and 3. in the deductible sources of income section, we will estimate your entitlement to these benefits. We can reduce your payment by the estimated amounts if such benefits:

- have not been awarded; and
- have not been denied; or
- have been denied and the denial is being appealed.

Your Long Term Disability payment will NOT be reduced by the estimated amount if you:

- apply for the disability payments under Item(s) 1., 2., and 3. in the deductible sources of income section and appeal your denial to all administrative levels UNUM feels are necessary; and

- sign UNUM's payment option form. This form states that you promise to pay us any overpayment caused by an award.

If your payment has been reduced by an estimated amount, your payment will be adjusted when we receive proof:

- of the amount awarded; or
- that benefits have been denied and all appeals UNUM feels are necessary have been completed. In this case, a lump sum refund of the estimated amount will be made to you.

If you receive a lump sum payment from any deductible sources of income, the lump sum will be pro-rated on a monthly basis over the time period for which the sum was given. If no time period is stated, we will use a reasonable one.

***HOW LONG WILL UNUM CONTINUE TO SEND YOU PAYMENTS?***

UNUM will send you a payment each month up to the **maximum period of payment.** Your maximum period of payment is based on your age at disability as follows:

| Age at Disability | Maximum Period of Payment |
|---|---|
| Less than age 60 | To age 65, but not less than 5 years |
| Age 60 | 60 months |
| Age 61 | 48 months |
| Age 62 | 42 months |
| Age 63 | 36 months |
| Age 64 | 30 months |
| Age 65 | 24 months |
| Age 66 | 21 months |
| Age 67 | 18 months |
| Age 68 | 15 months |
| Age 69 and over | 12 months |

***WHEN WILL PAYMENTS STOP?***

We will stop sending you payments and your claim will end on the earliest of the following:

- during the first 12 months of payments, when you are able to work in your regular occupation on a **part-time basis** but you choose not to;
- after 12 months of payments, when you are able to work in any gainful occupation on a part-time basis but you choose not to;
- the end of the maximum period of payment;
- the date you are no longer disabled under the terms of the plan;
- the date you fail to submit proof of continuing disability;
- the date your disability earnings exceed the amount allowable under the plan; or
- the date you die.

DRAFT______

### *WHAT DISABILITIES HAVE A LIMITED PAY PERIOD UNDER YOUR PLAN?*

Disabilities, due to sickness or injury, which are primarily based on **self-reported symptoms**, and disabilities due to **mental illness** have a limited pay period up to 12 months.

UNUM will continue to send you payments beyond the 12 month period if you meet one or both of these conditions:

1. If you are confined to a **hospital or institution** at the end of the 12 month period, UNUM will continue to send you payments during your confinement.

   If you are still disabled when you are discharged, UNUM will send you payments for a recovery period of up to 90 days.

   If you become reconfined at any time during the recovery period and remain confined for at least 14 days in a row, UNUM will send payments during that additional confinement and for one additional recovery period up to 90 more days.

2. In addition to Item 1, if, after the 12 month period for which you have received payments, you continue to be disabled and subsequently become confined to a hospital or institution for at least 14 days in a row, UNUM will send payments during the length of the reconfinement.

UNUM will not pay beyond the limited pay period as indicated above, or the maximum period of payment, whichever occurs first.

UNUM will not apply the mental illness limitation to dementia if it is a result of:

- stroke;
- trauma;
- viral infection;
- Alzheimer's disease; or
- other conditions not listed which are not usually treated by a mental health provider or other qualified provider using psychotherapy, psychotropic drugs, or other similar methods of treatment.

### *WHAT DISABILITIES ARE NOT COVERED UNDER YOUR PLAN?*

Your plan does not cover any disabilities caused by, contributed to by, or resulting from your:

- intentionally self-inflicted injuries
- active participation in a riot
- loss of a professional license, occupational license or certification
- commission of a crime for which you have been convicted under state or federal law
- pre-existing condition.

Your plan will not cover a disability due to war, declared or undeclared, or any act of war.

UNUM will not pay a benefit for any period of disability during which you are incarcerated.

### *WHAT IS A PRE-EXISTING CONDITION?*

You have a pre-existing condition if:

- you received medical treatment, consultation, care or services including diagnostic measures, or took prescribed drugs or medicines in the 3 months just prior to your effective date of coverage; and
- the disability begins in the first 12 months after your effective date of coverage.

### *WHAT HAPPENS IF YOU RETURN TO WORK FULL TIME AND YOUR DISABILITY OCCURS AGAIN?*

If you have a **recurrent disability**, UNUM will treat your disability as part of your prior claim and you will not have to complete another elimination period if:

- you were continuously insured under the plan for the period between your prior claim and your recurrent disability; and
- your recurrent disability occurs within 6 months of the end of your prior claim.

Your recurrent disability will be subject to the same terms of this plan as your prior claim.

Any disability which occurs after 6 months from the date your prior claim ended will be treated as a new claim. The new claim will be subject to all of the policy provisions.

If you are covered under another group long term disability plan on the date of your recurrent disability and are entitled to payments under that plan, you will not be eligible for further payments from UNUM.

*Attorneys at Law:*
Donald C. Anderson
John V. Tucker

*St. Petersburg*
2101 Fifth Avenue North
St. Petersburg, FL 33713

*The Law Offices of*
ANDERSON & TUCKER

***Paralegal Representatives - Social Security Disability/SSI:***
Michele Anderson Marois
Christopher P. Marois

***Please Reply To:***
**P.O. Box 360**
**St. Petersburg, FL 33731**
**Phone: (727) 323-8886**
**Fax: (727) 323-3252**
**E-Mail: erisa@tampabay.rr.com**

April 9, 2001

Randy Rogers
Lead Appeals Specialist
UnumProvident Corporation
1 Fountain Square
Chattanooga, Tennessee 37402

***Via Certified Mail: Z 596 689 889***
**Return Receipt Requested**

RE: Our Client: Tim Dunn
Soc. Sec. Nº 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
Claim Nº 0098663135
Policy Nº 00023601-0003
Company: Suiza Foods, Inc.

Dear Mr. Rogers:

Apparently there was some confusion as to when your company would be conducting its review. I am enclosing a vocational evaluation completed by John Orphanidys, MA, CRC, CVE, CCM , of Rehabilitation Counseling Associates, Inc. Mr. Orphanidys very commonly conducts vocational evaluations for Workers' Compensation insurance carriers, and he conducted an extensive interview and some testing of Mr. Dunn and concluded that Mr. Dunn is incapable of performing his own, as well as other occupations.

Please re-evaluate this new information in light of applicable case law, and advise me of your company's determination as to whether or not it will reverse its determination to deny benefits.

Very truly yours,

John V. Tucker

QUALITY PERFORMANCE SUPPORT
APR 1 2 2001

JVT/kk
Enc.: Vocational Evaluation, John Orphanidys 3/27/01
cc: Tim Dunn (w/ enc.)

EXHIBIT
B

# Rehabilitation Counseling Associates, Inc.

4427 Central Avenue • St. Petersburg, Florida 33713
(727) 323-4220 • Fax (727) 321-6564


March 27, 2001

## VOCATIONAL EVALUATION

RECIPIENT:
John Tucker, Esq.
PO Box 360
St. Petersburg, FL 33731

REGARDING:
Tim Dunn
SS#: 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

Dear Mr. Tucker:

Mr. Dunn was referred to complete a vocational evaluation to determine whether he was capable of performing the material and substantial duties of his regular occupation, as a senior plant manager, or as a vault lead supervisor or any gainful occupation for which he would reasonably be fitted by education, training or experience, that occupation which could be expected to provide him at least equal to his gross disability payments within twelve months of his return to work. Further, whether he can perform the essential job functions and materials and substantial duties of his job, alternative job or a job at his level of disability income benefits with or without accommodations was asked to be commented on as well.

## REHABILITATION FACTORS

Background Information

Mr. Dunn is a 49 year old, white, divorced male, born June 20, 1951 in Chicago, moving to Florida in 1982, 6'2", 220 pounds, pleasant individual. He notes one of the reasons for his divorce was that his ex-wife complained that he "worked too much". He notes his father was a dairyman as was his entire family. He has one adopted son, Sean, age 19 and a younger son, Timmy, age 14, who lives with him as does his fiancee, who resigned her position in order to provide medical management on his behalf following his cardiac surgery. Currently he is not employed, SSDI is still pending, he relying on his savings at this time, noting some minor degree of financial stress.

There are no convictions or violations of law that would affect his vocational functioning.

In review of his activities of daily living, he notes prior to his heart condition rising between 3:00 - 4:00 AM, working 10-12 hour days, sometimes 24 hours continuously. He notes prior to his surgery, capable of managing his household duties in terms of sweeping, vacuuming, household maintenance as well as yard work, now needing assistance. His hobbies included basically working, now spending more time with his family, describing himself as a "workaholic" in the past, again averaging 70-80 hours a week. In the past he enjoyed offshore fishing, but now is fearful of going offshore due to his heart condition.

In the past, he describes being capable of going four to six hours per night of sleep for five to six days, now requiring eight to ten hours per night plus naps, with significant drowsiness following his surgery.

From an educational standpoint, he noted completing high school in 1969 in Chicago and Northern Illinois University from 1969 to 1973 with a BA in Political Science. Following this, he worked on the job training in the dairy through high school and college and subsequently went into this.

There is no related military experience.

When exploring any previous illnesses, injuries, operations and/or hospitalizations that would affect his vocational functioning, he notes the following:

- Jaundice from food poisoning in sampling raw milk in the receiving department, no residuals

- Broken collar bone as youth with no residuals

- Hernia, notes surgery, this becoming problematic as he would not take off from work to care for this, no residuals, returning to work in 10 days

Since his accident, he notes having two car accidents, again because of what he notes is lack of concentration, again having no residual limitations or medical conditions as a result of this.

Regarding his current cardiac condition, he notes having a heart attack on March 27, 1999, with warning signs approximately five to seven days before, which he ignored. He was initially seen at emergency services in Winter Haven by Dr. Vigoreaux, transferred to Lakeland Regional Medical Center under the care of Dr. Ebersole, with surgery conducted on March 27 with a principle diagnosis of acute anteroseptal wall myocardial infarction, single vessel coronary artery disease of the left anterior descending artery, status post intracoronary stent placement on 3/27/99.

Records of Dr. Owen and Dr. Arana were also reviewed.

Records of Dr. Bhatia, his cardiologist, were also reviewed.

- 5/6/99, noting ejection fraction was found to be 31%, recommending an echocardiogram and exercise thallium test.

- 5/12/99 the thallium test showed abnormal exercise SPECT thallium study compatible with extensive anterior spical and possibly inferior wall infarction, no evidence of any significant ischemia noted.

- 5/18/99 her notes indicated the patient works in a very stressful situation, working 60-70 hours a week and undergoes a lot of stress because of changes in the work place. He should not go back to his usual job. It is in this patient's overall best interest not to return to full time work like he did earlier.

- 5/20/99 restrictions note no lifting more than 10-15 pounds or work in stressful situations

- 6/21/99 follow up. Remains disabled from his present job.

- 7/12/99 Physical Capacities Evaluation notes basically sedentary work alternating sitting, standing and walking, should not be around moving machinery, automotive equipment, exposure to dust, fumes and gasses and other hazards.

** (Note there is no indication of vocational temperament factors, job analysis and/or stress assessment, usual and customary in a cardiac evaluation.)

- 8/24/99 follow up

- 11/29/99 Physical Capacities evaluation notes he can walk a maximum of an hour alternating, basically occasionally pushing, pulling, lifting, patient's medical condition would prevent him from traveling to and from work due to his extensive left ventricular dysfunction.

** (Again there is no indication for vocational temperament factors, job analysis and/or stress factors, usual and customary in a cardiac evaluation.)

- 12/23/99 patient does not have the stamina he used to have, partly due to LV dysfunction although he is on beta blockers.

- 1/28/00 cannot do anything exertional or stressful, these restrictions are permanent, 10-20 pounds lifting, pushing, pulling, sit/stand 4-6 hours, walking 1-2 hours, would have to be very sedentary.

- 5/30/00 follow up

- 8/15/00 underwent stress test done by Dr. Owen noting a total of 6 minutes and 44 seconds, discontinued because of dyspnea, no chest pain at peak exercise but felt lightheaded, almost presyncopal. Blood pressure was 139/58 and 25% functional aerobic impairment noted. He noted a stress test done recently showed he was presyncopal when he exercised. He went at submaximal levels, his ejection fraction was 30-35% in May. Under no circumstances can he return to his prior job. He is on maximal medical therapy at this time, think his prognosis is guarded and under no circumstances can he return to his prior job. He is already having symptoms of cardiac limitation in the way of easy fatigability, tiredness, angina pectoris, dizziness and even near presyncope which occurred on the stress test recently. Return to work would aggravate his symptoms and put the patient in danger. Permanently disabled from his prior job.

- 10/17/00 still having chest discomfort off and on and no significant change, tires easily, takes naps in the afternoon. Recommends he abstain from heavy exertion and will call with the chem plus report, see in 3-4 months

- 1/31/01 nuclear cardiology stress test noted patient exercised for 4 minutes when he started having extreme shortness of breath, dizzy, fatigue and some achiness in the chest. He almost felt like he was going to black out and his color looked poor. The overall ejection fraction is calculated to be around 27%. The left ventricle also appeared dilated. Conclusion: markedly abnormal exercise myoview scan demonstrating evidence of prior infarction involving the anteroseptal apical, inferior infarction with mild peri-infarction ischemia, again noting at low levels of exercise the patient had symptoms of extreme fatigue, shortness of breath, dizziness and some chest tightness.

- 2/7/01 follow up. Reviewed stress test

- 2/8/01 Cardiac Residual Functional Capacity Questionnaire. Status post anterior angioplasty and stent placement, will see every 3-4 months. Diagnosis angina pectoris Class II. Symptoms include chest pain, shortness of breath, fatigue, dizziness, sweatiness. Patient having mid sternal chest pain 3-4 times a week brought on by emotional stress and exertion. Not a malingerer. Incapable of even low stress jobs. Patient's physical symptoms and limitations cause emotional difficulties such as depression and chronic anxiety. Emotional factors contribute to the severity of the

patient's subjective symptoms and functional limitations. Patient experiences cardiac symptoms often. Basically lifting 10 pounds, avoid exposure to cold, heat, humidity, wetness, noise, fumes and hazards. Likely to produce good days and bad days.

Dr. Michael Geer:

- 8/27/00 - patient had symptoms of fatigue during stress test that could be related to his cardiomyopathy versus beta blocker therapy. Patient had complaint of dizziness during the study however there was no decrease in blood pressure or change in heart rate to explain this symptoms from a cardiovascular standpoint. Treadmill performance does not support restrictions to the performance of sedentary to light exertion. Should be restricted from performing prolonged levels of moderate to strenuous exercise. It would be helpful for the attending physician to support additional restrictions and limitations with objective documentation of stress induced ischemia or stress induced reduced maximum oxygen extraction or anaerobic threshold (parameters obtained during a metabolic stress test).

In addition, his entire file was reviewed noting other records clinically significant to include:

- 7/27/00 correspondence of Betty Morris, MS, CRC, agreeing with occupation of production superintendent.

- 7/18/00 clinical review request indicates he cannot do anything exertional or stressful, allowed to carry/lift 10-20 pounds.

- 3/7/00 detailed activity listing requested by Laura Turpin. Created by C4A1B. 10-15 pound work in stressful situation. Prognosis guarded. Occupational analysis: production superintendent, reviewing duties and physical capabilities.

- 2/24/00 CRC worksheet. No lifting over 10-15 pounds or work in stressful situations, sedentary work only.

- 2/4/00 - LTD Re-Assignment. Not to lift more than 10-15 pounds or work in stressful situations. Would need a very sedentary occupation to consider return to work.

- 1/25/00 Medical Resource referral by Joan Henderson, RN. Cardiologist notes on 5/18/99 he could work in a less stressful position and at decreased hours, recommending information regarding occupational duties and hours worked

- 6/8/99 Short Term Disability Employer Statement. Supervisor David Meade. Occasionally lifting 21-50 pounds

Employment History

Mr. Dunn notes at the time of his injury being a dairy plant manager, this consistent with the Department of Labor's Dictionary of Occupational Titles as a Production Superintendent, DOT #183-117.014. He first became employed in 1975 - 1981 at Wanser Dairy in Illinois in the production plant where he was transferred to Florida at Velda Farms from 1981 - 1999. From 1981 to 1985 he was an assistant plant manager and from 1985 to 1999 he was the plant manager.

Vocational Testing

The Occupational Stress Inventory is a measurement of occupational stress, psychological strain, and coping resources, offering an integrated assessment and model of linking sources of stress in the work environment, the psychological strain experienced by individuals as a result of the work stressors, and the coping resources available to combat the effects of stressors and alleviate strain.

The employee scored significantly high in areas of role overload, viewing work loads as increasing unreasonably and unsupported by needed resources. He would perceive work as needing more help, and experiencing difficulties working under tight deadlines at this time. In addition, he would report caught between conflicting demands and factions of work, needing to continue with such things as production levels while also balancing labor relations, EEOC demands with that of quality assurance, etc. His scores would suggest that he would experience stress in assuming high levels of responsibility for the activities and work performance of subordinates, worried that others would not perform. Where he is sought out for leadership and frequently having to respond to others' problems, he would most likely experience stress from these types of duties. Working under pressure from working with the customer demands and difficult employees or the public, his test scores would likely suggest he would experience stress. The physical environment itself where he is exposed to high levels of noise, erratic work schedules and chemical substances in and of itself would suggests he would experience stress from this area as well.

He would experience stress in terms of vocational strain as to fearfulness of making errors in his work, particularly in light of quality assurance, tight performance and precise attainment of bacterial levels where if errors exist, an epidemic may occur. He would also experience. vocational stress in terms of fearfulness that the quality of his work is suffering as well as complaints of concentration problems.

He would have good coping skills in the area of social support where he would feel that he would have at least one person he could count on.

A questionnaire on Job Related Stressors, Part C was administered. This is a questionnaire to determine the types and consequences of stress which exist in the individual in an attempt to determine what kinds of stressful situations might exist in a variety of employment settings. Work related stress has been defined as a person's recognition of their inability to cope and with demands relating to work, this questionnaire allowing an individualized basis for determining vocational potential for those with stress-related symptomatology.

He most likely would experience stress and would not feel comfortable and capable in determining or interpreting work procedures for others and assigning specific duties and evaluating their work. He would have difficulties expressing feelings to others as well as influencing others in favor of his point of view. At this point, he would prefer jobs that would be clearly laid out and would require minimal interpretation. He noted he would have difficulties and find stressful working with frequent deadlines and time pressures. He also would experience stress in jobs that require set limits, tolerances and standards. He would experience stress when job requirements are not clearly defined, and become nervous. Any negative evaluations or feedback or work problems would significantly interfere with his job. He notes difficulties in understanding and remembering detailed and complex instructions as well as working at a consistent pace. Although he would prefer a job having specific production standards, he notes unable to maintain production standards at this time due to his sense of stress, he having trouble following precise work rules and schedules. Although he is most productive when he has minimal supervision, he notes he would most likely experience stress with close observations and supervision of his work would make him feel uncomfortable. He would prefer not to be responsible for other people's work, not being a leader of a small group in getting a job completed. Taking responsibility for a major project would be very stressful for him and does not believe he would be as productive when the job pace changes daily. When working at a fast consistent pace for a long period of time he most likely would become anxious, noting he would not enjoy working with machines that produce work at a routine pace, again noting his work is less productive when he has frequent deadlines and time pressures.

<u>Vocational Analysis</u>

Mr. Dunn's past relevant work experience as a production superintendent is considered basically a light duty position. From a physical and exertional standpoint, on a 40 hour work week basis, the majority of his essential job functions would require the necessary vocational behaviors such as vitality of work energy, work stamina, steadiness of work, quality of work, maintaining a production rate. It was not clear that his most recent stress test of January 31, 2001 or the cardiac residual functional capacities noted by Dr. Bhatia would allow him to perform in this vocational manner. It is not clear that he has the necessary vocational behaviors to maintain work in his past relevant work experience in terms of the materials and substantial duties of a plant manager and/or vault lead supervisor, based on his physical capabilities alone in completing a normal work day and work week without interruptions from

cardiac based symptoms while performing at a consistent pace without an unreasonable number and length of rest periods. Walking up and down stairs throughout the plant, observing the machinery, problem solving in different parts of the plant would all include extensive walking in a physical environment that he most likely would experience as stressful.

As noted by the Department of Labor, the category Temperament is one of the components of job analysis because different job situations call for different personality traits on the part of the worker; experience in placing individuals in jobs indicates that the degree to which the worker can adapt to work situations is often a determining factor for success. A person's dissatisfaction or failure to perform adequately can sometimes be attributed to an inability to adapt to a work situation rather than an inability to learn and carry out job duties.

Mr. Dunn's past relevant work experience as defined by Senior Plant Manager include the following vocational temperaments as defined by the Department of Labor's Dictionary of Occupational Titles, further reviewed with Mr. Dunn noting areas of stress to include such things as:

D - **DIRECTING**, controlling or planning activities of others. This temperament occurs when Mr. Dunn is required to negotiate, organize, direct, supervise, formulate practices and make final decisions.

As this was a 24 hour production plant, he was "on call" 24 hours a day, having erratic sleep patterns as well as erratic work schedules, a non-stop operation.

He describes the necessity to sleep with the telephone next to his bed where managers would frequently call him at his home at night, basically being on call to handle problems that the subordinates would be unable to handle in part of his problem solving responsibilities.

V - Performing a **VARIETY** of duties. He is responsible for managing several duties in differences in technology, techniques and procedures, environmental factors and physical demands or work situations and this would be a factor under this temperament in appraising or investigating conditions or state of objects, systems or activities, often changing and performing a variety of duties, often changing from one task to another without loss of efficiency or composure.

In charge of the entire plant, he would be required to supervise those who are maintaining, repairing or overhauling machinery and equipment, organize and lead groups of activities of his subordinates, coordinate and arrange schedules for delivery to assure efficiency and maintenance of contracts.

In stock keeping units, he described over 150 perishable items where they would have a 12 day shelf life. It becomes very tense in not only having the appropriate shelf life and managing distribution to avoid spoilage, but also in assuring that the products stay cold and refrigerated regardless of weather, hurricanes, electrical shortages and such factors for which he would be responsible in dealing with as a manager.

In addition to the distribution of items and product rotation, maintaining the electrical facilities at the proper level while maintaining not only customer relations but also labor management personnel, he found difficult and stressful.

P - Dealing with **PEOPLE.** This is a factor in Mr. Dunn's work in establishing a corporate culture where managers and the union cooperatively work with each other, having an agreeable working relationship, contacting others in customer service in a successful manner, as well as working through committees.

He noted in his particular job duties, when considering this factor, coordinating activities of his workers engaged in distributing their products under tight deadlines where he would be in jeopardy of losing contracts should he not be in 100% compliance, would be stressful in and of itself.

The scheduling and delivery and recording times and dates to assure customer satisfaction, while also promoting sales and creating good will for problems would require not only good people skills, but again, in and of itself, Mr. Dunn would find stressful.

Interviewing and dealing with labor relations, EEOC complaints, while maintaining productivity of 100 plus employees in maintaining his material and substantial duties of his job, which he would be required to perform, which in and of itself would be stressful.

Maintaining customer relations when a product was to be delivered to a company may be late, for example the school board requiring milk products be delivered by 6:00 AM, having problem solving not only with his staff but with the account, such as Disney World, Cosco and 7-11s in maintaining the schedules and the accounts' desire to have these on time, the accounts not wanting any quality problems, his job in trying, to keep everyone happy. Failure to do meet delivery schedules could lose the competitive bidding rights for specific contracts.

Union, EEOC and labor relations in coordinating, problem solving and dealing with this factor was critical and could become tense, again the material and substantial duties of his job This became stressful at times as the employer could be disallowed from bidding if not compliant with all EEOC guidelines.

Similarly, OSHA safety requirements required close vigilance, scrutiny and observation of the plant to assure eliminating injuries and keeping the plant operational.

J - Making **JUDGEMENTS** and decisions. This position requires extensive judgement in managing the overall plant, judgement used in determining the most feasible plans for presenting policies and procedures to the upper level staff, judging the effectiveness of different physical arrangements of the plant layout, judgement required evaluations of the ability and behaviors and performance of his staff, also judging speed, performance and relative production of the overall plant in and of itself would be stressful.

He would have to exercise extensive judgement and management in following safety procedures for the quality of the milk products due to the potential for an epidemic if they do not follow the appropriate sanitary procedures.

Maintaining loss control which would affect the budget if there were spills, there being significant pressure for reducing and/or eliminating accidents, with stress regarding spills and the effects this would have on the loss of profits.

Estimating the demand for the products, which is necessary prior to the orders coming in required not only a degree of educated guess, which would again affect the stock keeping, this becoming quite stressful should there be an error in the estimate and/or they do not have the product ready, as part of their contract, as they cannot be out of anything at any one time.

Maintaining the inventory for the daily production and rotation in and of itself was stressful and certainly a factor in his job.

Maintenance of equipment where the equipment was outdated, however the budget specialists not okaying the new equipment to be purchased was stressful and tense when he was required to oversee the staff and figure out ways to keep the machinery operational until the new equipment could be purchased and/or approved.

The budget, in terms of overall cost analysis, was stressful to do and re-do to match these requirements.

Similarly, I have read the Vault Lead Supervisor position, which was prepared in July 1998, who reports to the Vault Manager. The summary is described as supervising and coordinates activities of workers concerned with receiving, storing, inventory, preparing, issuing and shipping products for distribution, studying of shipping notices, inspecting load operations to assure compliance with specific Department of Transportation requirements, examining material handling equipment for defects, directing movement of shipments, shipping and receiving.

The candidate must pass a pre-employment physical and drug screening prior to commending work. While performing the duties of this job, the employee is regularly required to stand, use both hands and talk and hear frequently. The employee is required to frequently walk, stretch and reach with hands and arms, occasionally required to sit, climb, balance, stoop, kneel and must occasionally lift and/or move up to 75 pounds.

From a physical standpoint, he would be unable to perform this position. From a stress-related standpoint, when considering temperament factors a noted above, he would also be unable to perform this position.

In completing a vocational analysis as to other types of jobs which he could do in the open labor market, within his physical exertional limitations, as well as non-exertional temperament factors, there does not appear to be any jobs to which he could return to at his level of disability benefits.

Behavioral Observations

Mr. Dunn appeared to look older than his stated age, oriented to time, person and place. He appeared to have significant concerns regarding the effects the stress would have on his cardiac function and well being, significantly modifying his life style as noted above.

He impressed this consultant as a very thorough, conscientious,, driven individual who thrived on stress, again recognizing the effects this has had on his medical condition.

**DISCUSSION**

Based on the review of the medical records, vocational testing and clinical interview, as well as vocational research utilizing the Department of Labor's Dictionary of Occupational Titles as well as Handbook for Analyzing Jobs, Mr. Dunn would be unable to return to past relevant work experience performing the material and substantial duties of a plant manager and/or vault manager with or without accommodations.

He would be unable to qualify for jobs which would provide financial reimbursement at the rate of his disability benefits.

Although this consultant concurs with the CRC's occupation and description of a production superintendent, it does not appear that the vocational counselor took into consideration the non-exertional limitations noted of "limited stress" and/or the Department of Labor's Dictionary of Occupation Titles' temperament factors as noted above. When reconciling the differences of this consultant's opinion with that of the other vocational evaluator, these would be critical factors and points to consider.

In addition, when considering the difference between Dr. Geer's and Dr. Bhatia's opinions, it does not appear that Dr. Geer has had the benefit of evaluating individually Mr. Dunn, nor following him on a longitudinal basis In addition, he has not had the opportunity or benefit of the most recent stress test.

In addition, it does not appear that Dr. Geer has factored in the vocational implications of his non-exertional limitations from a cardiological standpoint, specifically, the impact on his ability to tolerate stress.

Again, I appreciate the opportunity to evaluate Mr. Dunn. Should you need clarification of any of the above information, please do not hesitate to contact me.

Sincerely,

John A. Orphanidys /cb

John A. Orphanidys, MA, CRC, CVE, CCM
Director of Rehabilitation

JAO/cb

**CERTIFIED**

Z 596 689 789

**MAIL**

*Law Offices of*
*Anderson & Tucker*
*P.O. Box 360*
*St. Petersburg, Fla. 33731*

ADDRESS SERVICE REQUESTED

**Randy Rogers**
**Lead Appeals Specialist**
**UnumProvident Corporation**
**1 Fountain Square**
**Chattanooga, Tennessee 37402**

QUALITY PERFORMANCE SUPPORT
APR 1 2 2001

18E

UNUM.

*Protecting everything you work for*

April 13, 2001

John V. Tucker
Anderson & Tucker
PO Box 360
St. Petersburg FL 33731

| | |
|---|---|
| RE: | Tim Dunn |
| SSN: | 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 |
| Claim Number: | 0098663135 |
| Policy Number: | 00023601-0003 |
| Employer: | Suiza Foods |

Dear Mr. Tucker:

Your letter of April 9, 2001 was received in our department on April 12, 2001.

Please note that we must regrettably decline your further request for an appellate review on Mr. Dunn's file. As you know, our company is fiduciary to the employee Long-Term Disability benefit plan under which Mr. Dunn was covered. As fiduciary, we have responsibilities to providing our customers with a full and fair appellate review, which we believe we have demonstrated by our appeal evaluations. However, we must also consider our responsibilities to the protecting the plan itself. Therefore, we are unable to again review this matter. Therefore, the information regarding Mr. Dunn is being returned as the administrative remedies were exhausted with Mr. Dunn's appeal decision of March 29, 2001.

Thank you for your attention in this matter.

Sincerely,

Randy Rogers
Lead Appeals Specialist
UnumProvident Corporation



EXHIBIT
C